MICHAEL A. RITA, d.b.a. MODERN APPLIANCE CO.
*vs.*
THE MAPLE DINER, INC.

Court of Common Pleas    Hartford County    File No. 40405

MEMORANDUM FILED NOVEMBER 3, 1941.

*Edward H. Smith,* of Hartford, for the Plaintiff.

*George Schwolsky,* of Hartford, for the Defendant.

KLAU, J. On or about October 1, 1940, Mr. DePathy, president of the defendant corporation, which owns and operates a diner on Maple Avenue in the City of Hartford, went to the plaintiff's place of business located on Webster Street in that city to inquire as to a beer cooling refrigeration machine for draught beer to be sold in the diner. The plaintiff was a dealer operating under the name of The Modern Appliance Company, selling heating, cooking and refrigeration equipment, including automatic beer coolers known as the "Brubox", manufactured by the Worthington Pump Company. There were .two such machines on the plaintiff's premises which were not installed, and so the plaintiff took Mr.

DePathy to a tavern in which such a machine had been installed to show him how it operated. Upon returning to the plaintiff's place of business, Mr. DePathy said he was interested in purchasing such equipment, but was unwilling to pay the price for a new one, which was $775, plus the cost of installation. The plaintiff showed him the two beer coolers which were on the premises, one of which had been used for demonstration purposes, and the other of which had been repossessed from a tavern in Manchester to which it had been sold about four months before and upon which payments had been defaulted. The plaintiff represented to Mr. DePathy that both machines were in good condition and not in need of repairs, and Mr. DePathy relying on the plaintiff's skill and judgment said that he would take either of the boxes. The plaintiff actually delivered and installed the repossessed box.

Since the refrigerating equipment was to be installed in the basement of the diner, the plaintiff agreed to provide risers leading from the equipment to the counter in the diner above from which the draught beer was to be dispensed. Within these risers ran the beer lines from the barrel which is placed in the refrigeration box and around the beer lines in a circuit ran the refrigerating lines.

The plaintiff agreed to sell the equipment and perform the installation for $500, $100 of which was to be paid immediately by the defendant and which the defendant did pay, another $100 on completion of installation, and the balance of $300 thirty days after the completion of the installation.

After this oral agreement was made, and at the defendant's request, the plaintiff agreed to supply and install equipment for cooling seltzer and water to be attached to the refrigeration equipment already sold, although he told Mr. DePathy that such additional equipment had not been installed on previous installations of this type of beer cooling equipment, but that he, the plaintiff, was of the opinion that it would work all right.

The plaintiff hired a refrigeration mechanic to make the installation. Because it was necessary to order the risers from the manufacturer, work on the installation did not begin until October 18th.

When the equipment was delivered to the diner, it was

found that a fence and a wall of matched boards on the premises had to be taken down to permit the entry of the "Brubox" into the basement. Upon receiving permission from the defendant, the plaintiff caused the fence and wall to be taken down and the box was carried into the basement and set at a place designated by the defendant. The plaintiff has never reerected the fence, although he did put back the wall of matched boards.

The mechanic hired by the plaintiff, a Mr. Paar, did not finish with his work of installation until October 27th. The work involved connecting the refrigeration lines and coils with the mechanism which causes the cycle of refrigeration by compression of a liquid known as Freeon into a gas, the gas in turn causing refrigeration by absorption of heat from the copper refrigerating coils and lines; installation of a motor which gives power to the compressor; installation of the seltzer and water cooling mechanism; and the manufacture of a brine solution which was poured into a tank at the bottom of the refrigerating box in which the kegs of beer were placed. This box held two kegs of beer. The brine solution was used to cool warm beer drawn from kegs of beer just placed into the box more quickly than the beer would be cooled by the refrigerating lines, by means of a shower ring which could be placed around the circumference of the keg of beer. By means of another motor which could be controlled as to time of operation, the brine in the tank, which was kept cool by refrigerating coils which were a part of the entire refrigerating circuit, could be sprayed over the keg for periods of ten or twenty minutes or longer, thus cooling the contents so that cool beer could be drawn sooner than if it had been necessary to wait until the refrigerating coils cooled the beer in the beer lines. This brine sprayer and mechanism was an important feature of the "Brubox" and one of its chief sales features. The brine consists of a solution of anti-freeze liquid and water, and the manufacturer of the "Brubox" recommended the use of an anti-freeze known as "Brukol" as an ingredient in the brine solution. Paar used a commercial anti-freeze purchased at a nearby gas station in the brine which he poured into the tank.

Paar completed his installation on October 27th. Within a few hours thereafter on stopping in at the diner he found the beer lines frozen and the bartender unable to draw draught

beer. Believing that the valve controlling the refrigerator had been turned, he instructed the bartender as to the position at which the valve should be maintained.

From the time installation was completed until December 2nd, when the defendant through Mr. DePathy notified the plaintiff to remove the equipment from the premises, the equipment failed to function on numerous occasions.

On two occasions the regulating valve located adjacent to the spigot and designed to control the flow of beer from the beer lines out of the spigot, broke, thus shutting off the supply of beer from that spigot. These the plaintiff replaced after several telephone calls from Mr. DePathy. On other occasions the beer line froze so that it was impossible to draw beer. On other occasions the brine in the tank either froze or became slushy so that it became impossible to pre-cool the beer, and only warm beer could be dispensed, which was unsatisfactory to the customers of the diner. During the period from October 27th, when installation was completed, to December 2nd, when the defendant by registered letter requested the plaintiff to remove the box and return the $100 which he had paid, the defendant was unable to sell the quantity of draught beer which he could have sold had the equipment operated properly, and had to sell bottled beer, a condition which did not satisfy the demands of his patrons. Paar frequently came into the diner in answer to the complaints DePathy made to the plaintiff. Despite his efforts, the equipment did not function satisfactorily. On the occasion of Paar's last visit to the diner, on and after the plaintiff had on December 7th received a telegram from the defendant's attorney telling him to remove the equipment, otherwise the defendant would itself do so and hold him responsible for the cost, Paar had removed a rod which operated in conjunction with the regulating valve located near the spigot and was attempting to enlarge it by welding a piece of brass into the length. DePathy told him that he could no longer get along with the equipment, that he had advised the plaintiff to remove the equipment and return his down payment, and that under the circumstances there was no use in Paar's continuing his endeavors to put the equipment into operating condition.

At the time the defendant offered to return the equipment to the plaintiff, it was in as good a condition as at the time he first received it from the plaintiff. The plaintiff refused

to accept the return of the equipment or to refund the down payment, and brings this action to recover the balance of $400 claimed to be due under the contract, alleging that the defendant interfered with him while he was in the process of completing the installation by refusing to permit him to continue, and that he was at all times ready and willing to complete the installation.

The defendant denies these allegations and sets up as a special defense and set-off a breach of warranty in that the equipment was unfit for the purposes for which it was purchased, as well as faulty installation of the equipment, and that although it offered to return the equipment to the plaintiff upon return of the down payment, the plaintiff refused to accept the equipment and refused to repay the down payment.

The essence of the agreement made between the plaintiff and the defendant was that the plaintiff would furnish and install an automatic beer cooling mechanism that would meet the needs of the defendant, of which the plaintiff was aware, in the conduct of the defendant's business; that the beer would be readily available and would be cool when drawn.

Whether the failure of the mechanism, sold and installed by the plaintiff, to operate continuously was due solely to defects in the mechanism or because of improper installation is difficult to determine. The freezing of the brine may have been caused by an improper solution and thereby was a result of an improper installation, or it may have been caused by excessive refrigeration of the refrigerating coils which in turn could have been caused only by a defect in the refrigerating mechanism. The frozen beer lines could only have been caused by a defect in the refrigerating mechanism.

Whether there was a breach of an express warranty that the box was in good condition, or a failure of consideration because of improper installation, in either event, or because both factors were involved, the defendant was entitled to rescind the contract, return the equipment and receive back his down payment. *Loveland vs. Aymett's Auto Arcade, Inc.*, 121 Conn. 231; *Noble Co. vs. Popielarczyk*, 125 id 699; Gen. Stat. (1930) §§4689, 4690.

While the burden of proof that the equipment was not in

good operating condition was on the defendant, it was not necessary for the defendant to show specific defects in the ·equipment. *Lane vs. McLay,* 91 Conn. 185, 188.

The transaction must be viewed in its entirety. The con' tract between the parties involved not only a sale but instal' lation as well, which on completion was to produce certain and definite results. The plaintiff was entitled to make minor adjustments within a reasonable time after October 27th, the date installation was complete, in order to assure satisfactory operation. The defendant was under no obligation to let the plaintiff continue to make repairs after a lapse of five weeks and to endure the inconvenience, if not damage, which the failure of the mechanism to function was causing him in his business. The defendant had not realized the bargain which he made with the plaintiff. His right to rescind was not based on any fault or negligence of the plaintiff. *Keyser vs. O'Meara,* 116 Conn. 579, 581. The consideration which the defendant was entitled to secure for his promise was the adequate operation of the refrigerating mechanism.

Consideration means a price or exchange bargained for in return for something else. The consideration which fails is not the consideration for a promise but the consideration for a performance. Failure of consideration will exist wherever one who has either given or promised to give some perform' ance fails without his fault to receive in some material respect the agreed exchange for that performance. Failure of con' sideration gives the disappointed party a right to rescind the contract but it is more often used as a defense to an action on the counterpromise. 3 *Williston, Contracts* (Rev. ed. 1936) §814; 5 *Page, Contracts* (2nd ed. 1921) §2978.

A breach which is material, or which goes to the root of the matter or essence of the contract, is fatal to the plaintiff's ·case in spite of his part performance. 3 *Williston, Contracts* (Rev. ed. 1936) §842.

Whether there was a breach of the express warranty made by the plaintiff that the refrigerating equipment was in good condition, or a failure of the consideration which the defendant was entitled to receive from the plaintiff, the defendant was entitled to rescind the contract and recover his part payment. Since the defendant has brought an action in this court against this plaintiff seeking recovery of the part payment, as well

as other damages, which action has been tried to this court at the same time as the present one, it is sufficient for the purpose of this suit to hold that the plaintiff cannot recover the balance of the purchase price. He may reclaim the equipment which he has refused to accept, subject to such rights which the defendant may have to enforce the repayment of his down payment and the costs of removal and storage.

Judgment may be entered for the defendant.